IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE PREMISES KNOWN AS 732 WHITTIER STREET, WASHINGTON, DC | Case No. _____ |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Allison Landsman, a Special Agent with the Environmental Protection Agency, Criminal Investigation Division, having been duly sworn, depose and state the following:

### AFFIANT's EXPERIENCE

1.      I am a Special Agent (SA) with the Environmental Protection Agency Criminal Investigation Division (EPA-CID), Washington Resident Office in Washington, District of Columbia. I have been employed with EPA-CID since 2013. I have completed the Criminal Investigator Training Program at the Federal Law Enforcement Training Center (FLETC) in Brunswick, Georgia. On January 31, 2014, I completed the Occupational Safety and Health Administration's (OSHA) Hazardous Waste Operations and Emergency Response (HAZWOPER) training program. This training taught me how to identify the existence of hazardous materials and eliminate hazardous exposure risks. Prior to being a federal law enforcement officer with EPA-CID, I supported civil inspections and enforcement for the Environmental Protection Agency for approximately five years as a Program Analyst. I have Bachelor's and Master's degrees in Environmental Science and Environmental Management from the University of Maryland.

2.      As a Special Agent with EPA-CID, I am authorized to conduct investigations of suspected criminal violations of federal laws, including violations of the Toxic Substances

Control Act (TSCA), 15 U.S.C. §§ 2689 et seq. As a federal law enforcement officer, I am also

authorized to apply for and execute search warrants under 18 U.S.C. § 3063.

3.     This matter is being investigated in conjunction with the Environmental Crimes

Unit of the Metropolitan Police Department (MPD), the District of Columbia's Office of

Inspector General (DC OIG), and the Federal Bureau of Investigation (FBI).


## INTRODUCTION

4.     This affidavit is submitted in support of an application for a search warrant for the

premises known as 732 Whittier Street NW, Washington, District of Columbia (hereinafter at

times referred to as "the Premises"), as further described in Attachment A, for the evidence and

instrumentalities described in Attachment B. Attachment C describes the duration and special

conditions for the warrant sought.

5.      I have personally participated in, and have witnessed many of the facts and

circumstances underlying the investigation of the offenses alleged in this affidavit. The

statements contained in this affidavit are based on reliable information provided to me by other

law enforcement agents and regulatory personnel, as well as official documents and reports I

have reviewed in furtherance of this investigation. This affidavit is being submitted for the

limited purpose of securing a search warrant. I have not included each and every fact known

concerning this investigation. I have set forth only the facts I believe are necessary to establish

probable cause for the issuance of the requested search warrant.

6.     Based on the facts set forth in this affidavit, I respectfully submit that there is

probable cause to believe that the location described in Attachment A hereto contains evidence

of various crimes, and instrumentalities and fruits of such crimes, including violations of TSCA, 15 U.S.C. §§ 2689 and 2615(b).

## LEGAL BASIS FOR THE SEARCH

7.      Lead is poisonous to the human body. Though completely preventable, lead poisoning continues to be a major environmental health problem in the United States. Lead exposure, while potentially harmful to individuals of any age, is particularly dangerous to children under the age of six. It can cause a variety of negative health effects, including learning problems, lowered intelligence, hyperactivity, and even death. Pregnant women are at particular risk from lead, which can cause miscarriage, reduced fetal growth, and premature birth. Lead-based paint in older homes and buildings is among the most common sources of childhood lead poisoning.

8.      The federal Residential Lead Hazard Reduction Act (LHRA) ensures that lead-based paint (LBP) and LBP hazards are taken into account in the sale, rental, and renovation of homes and apartments. The term "lead-based paint" means paint or other surface coatings that contain lead in excess of the limits established under section 302(c) of the Lead-Based Paint Poisoning Prevention Act, a statute requiring the Secretary of the U.S. Department of Housing and Urban Development (HUD) to "establish procedures to eliminate as far as practicable the hazards of lead-based paint poisoning with respect to any existing housing" covered by or receiving funds from a federal housing program. 42 U.S.C. §§ 4822(a)(1), 4841(3). The term "lead-based paint hazard" means any condition that causes exposure to lead from lead-contaminated dust, soil, or paint that is deteriorated or present in accessible surfaces, friction surfaces, or impact surfaces that would result in adverse human health effects as established by the appropriate Federal agency. 42 U.S.C. § 4851(b)(15).

9.      The regulations described below generally apply to "target housing," which means any housing constructed prior to 1978, except housing for the elderly or persons with disabilities (unless any child who is less than 6 years of age resides or is expected to reside in such housing) or any 0-bedroom dwelling. 42 U.S.C. § 4851(b)(27); 40 C.F.R. § 745.103.

### Lead-Based Paint Renovation, Repair, and Painting Rule

10.      In 2008, EPA promulgated the Lead-Based Paint Renovation, Repair, and Painting Rule (the RRP Rule). The RRP Rule requires that firms performing renovation, repair, or painting projects that could disturb LBP in homes built before 1978 have their firm certified by EPA, use certified renovators trained by EPA-approved training providers, provide owners and occupants with pre-renovation education, and follow lead-safe work practices.

11.      40 C.F.R. § 745.82 specifies that the RRP Rule applies to all renovations performed for compensation in target housing, except where:

   a.   A certified inspector or risk assessor makes a written determination that affected components are lead-free and the renovation firm obtains a copy of that determination; or

   b.   A certified renovator, properly using an EPA-recognized test kit or a laboratory recognized by EPA, determines that each component affected by the renovation is lead-free.

12.      "Renovation" means modification of any existing structure or portion thereof, that results in the disturbance of painted surfaces, unless part of an abatement. 40 C.F.R. § 745.83. According to the definition:

   The term renovation includes (but is not limited to): The removal, modification or repair of painted surfaces or painted components (e.g., modification of painted doors, surface restoration, window repair, surface preparation activity (such as sanding, scraping, or other such activities that may generate paint dust)); the

removal of building components (e.g., walls, ceilings, plumbing, windows); weatherization projects (e.g., cutting holes in painted surfaces to install blown-in insulation or to gain access to attics, planning thresholds to install weather-stripping), and interim controls that disturb painted surfaces. A renovation performed for the purpose of converting a building, or part of a building, into target housing or a child-occupied facility is a renovation under this subpart. The term renovation does not include minor repair and maintenance activities.

*Id.*

13.     As relevant here, "minor repair and maintenance activities" include "minor heating, ventilation or air conditioning work, electrical work, and plumbing that disrupt 6 square feet or less of painted surface per room for interior activities or 20 square feet or less of painted surface for exteriors . . . where the work does not involve window replacement or demolition of painted surface areas." Id.

14.     "Renovator" means an individual who either performs or directs workers who perform renovations. Id.

15.     "Abatement" means any set of measures designed to permanently eliminate LBP hazards, including: (1) removal of LBP and lead-contaminated dust, permanent enclosure or encapsulation of LBP, replacement of lead-painted surfaces/fixtures, removal or permanent covering of soil; and (2) related preparation, cleanup, disposal, and clearance testing. 15 U.S.C. § 2681(1); 40 C.F.R. § 745.223.

16.     Abatement is a specialized activity designed to address LBP in the home, while renovation activities covered by the RRP Rule may incidentally disturb LBP. Abatement work is subject to different regulations, but the present investigation does not directly concern abatement.

17.     The RRP Rule requires that specific lead-safe work practices be followed when conducting renovation subject to the rule. These practices are set forth in 40 C.F.R. § 745.85 and include: posting warning signs; containing the work area to prevent the release of dust or debris;

containing waste during and after renovation activities; cleaning the work area after the renovation is complete until no dust, debris, or residue remains; and performing a post-renovation cleaning verification to ensure that no dust, debris, or residue is still present on surfaces in and below the work area, including windowsills and the ground.

18.     Firms performing work subject to the RRP Rule must retain all records necessary to demonstrate compliance with the rule for a period of three years following completion of the renovation. 40 C.F.R. § 745.86(a). Specifically, firms must retain records that a certified renovator was assigned to the project, that the certified renovator provided on-the-job training for workers used on the project, that the certified renovator performed or directed workers who performed all of the tasks required by the lead-safe work practice standards, and that the certified renovator performed the required post-renovation cleaning verification.

19.     42 U.S.C. § 4852d(b)(5) makes violations of the RRP Rule a "prohibited act" under Section 2689 of TSCA, 15 U.S.C. § 2689.

***Lead-Based Paint Disclosure Rules***

20.     In 1996, pursuant to their statutory mandates, EPA and HUD jointly promulgated the Real Estate Notification and Disclosure Rule, 40 C.F.R. § 745.107, which requires sellers or lessors of pre-1978 housing not subject to a narrow set of exemptions, listed in 40 C.F.R.§ 745.101 and inapplicable here, to provide a potential buyer or tenant and agent with certain information pertaining to the presence of LBP and related hazards.

21.     In general, under 40 C.F.R. § 745.107, before the purchaser of target housing "is obligated under any contract to purchase or lease target housing," a seller or lessor must:

> a.  Provide the prospective purchaser or lessee with an EPA-approved lead hazard information pamphlet;

    b.   Disclose to the purchaser or lessee the presence of any known LBP and/or LBP hazards in the housing being sold, along with any additional information about these conditions;

    c.   Provide the purchaser or lessee with any records or reports available pertaining to LBP and/or LBP hazards; and

    d.   Disclose to each real estate or leasing agent the presence of any known LBP or LBP hazards, the existence of any available records or reports pertaining to LBP and/or LBP hazards, and any additional information available about these conditions.

22.    40 C.F.R. § 745.113 requires that each contract to sell or lease pre-1978 housing include an attachment containing the following elements:

    a.   A specified lead warning statement;

    b.   A statement by the seller or lessor disclosing the presence of known LBP and/or LBP hazards, or indicating no knowledge thereof, and any additional information available about these matters;

    c.   A list of any records or reports that the seller has provided to the purchaser or lessee about LBP and/or LBP hazards;

    d.   A statement by the purchaser or lessee affirming receipt of the required information and lead hazard pamphlet;

    e.   A statement by the agent that he or she has informed the seller or lessor of its obligations under the law and that the agent is aware of his or her own duty to ensure compliance;

    f.   Dated signatures of the seller or lessor, agents, and purchaser/lessee certifying to the accuracy of their respective statements; and

    g.   The purchaser or lessee's statement that he or she has received or waived the opportunity for an inspection or risk assessment.

23.    Sellers, lessors, and agents must retain a copy of the completed attachment for each transaction for a period of three years. 40 C.F.R. § 745.113(c).

24.    42 U.S.C. § 4852d(b)(5) makes violations of the disclosure requirements in either 40 C.F.R. § 745.107 or 40 C.F.R. § 745.113 a "prohibited act" under Section 2689 of TSCA, 15 U.S.C. § 2689.

### Criminal Penalties

25.    Under 15 U.S.C. § 2689, it is unlawful for any person to fail or refuse to comply with the TSCA provisions or associated regulations described above.

26.    Any person who knowingly or willfully violates any provision of § 2689 is subject to a criminal fine of not more than $50,000 for each day of violation, or to imprisonment for not more than one year, or both. 15 U.S.C. § 2615(b).

## FACTUAL BASIS FOR PROBABLE CAUSE

27.    Based on my investigation, some of which is outlined below, I have learned that District Properties (also known as District Properties.com Inc., DC Business License # 410516000409) is a company which purchases residential properties, renovates, and sells them for up to $2,775,000.  Its principal place of business is at 6500 Chillum Place NW, Washington, DC 20012. According to LinkedIn.com, Mohammad Sikder ("SIKDER") has been District Properties' CEO since October 2002. According to the website of the DC Department of Regulatory and Consumer Affairs (DCRA), SIKDER is the governor of District Properties.com

Inc., and the registered address is at 6500 Chillum Place NW. The company's registration is

"active." The DCRA Office of General Counsel stated that DCRA has taken enforcement actions

against District Properties on at least ten occasions and that the company has a history of permit

violations and citizen complaints.

28.     DCRA records show that another company named District Properties Limited

LLC was also registered in 2012 at the 6500 Chillum Place address. An individual named Jafar

Hashim was listed as the governor of this entity. The company's registration has since been

revoked.

29.     District Properties is closely intertwined with another company, Relux Homes

("Relux"), of which SIKDER is also the CEO according to LinkedIn.com. During an interview

with an EPA Region 3 Civil Enforcement inspector on October 15, 2015, District Properties'

Senior Project Manager Sushil Jha ("JHA") stated that the company uses the name Relux Homes

for properties built and renovated in Virginia and uses the District Properties name for properties

built and renovated in Washington, DC. (This may not be a consistent practice, as a DCRA

inspector observed and photographed a Relux Homes sign in front of a DC property on

November 21, 2014.) According to JHA, the managers and employees for District Properties and

Relux Homes are the same.

30.     District Properties avails itself of "special purpose entities," which are subsidiary

or alter ego companies created for a limited purpose, such as to shield the company from civil

liability. These entities include Rupsha 2007 LLC, Rupsha 2011 LLC, and Rupsha 2013 Inc. The

company has submitted numerous building permit applications under the "District Properties"

name for properties recorded as owned by "Rupsha" subsidiaries. Information submitted to

DCRA states that the principal place of business for Rupsha 2007 LLC, Rupsha 2011 LLC, and

Rupsha 2013 Inc., is at the 6500 Chillum Place NW address. Another related company, Rupsha

2012 Inc., lists its principal place of business as 6660 Tennyson Drive, McLean, VA 22101. This

address is listed as a property owned by Relux on Relux's website. SIKDER is listed as governor

for all of these "Rupsha" entities. In my experience, the use of such corporate sub-entities is a

common practice among real estate developers in the area.

      31.     52nd St Development Inc. is another apparent subsidiary of District Properties.

This entity purchased a property at 3801 52nd Street NW, Washington DC, which was

subsequently renovated. District Properties is listed as agent for 52nd St Development Inc., and

the registered address for the entity is at 6500 Chillum Place NW. SIKDER identified himself as

representative for the property's owner on a building permit application for the 3801 52nd Street

NW property. On two building permit applications for the property, the same phone number is

listed for both District Properties and 52nd Street Development Inc.

      32.     Because District Properties.com Inc., Relux, 52nd St Development Inc., and the

"Rupsha" entities are overlapping, I will use the name District Properties to refer to any and all

business entities managed by SIKDER from the 6500 Chillum Place NW address. On the

company's Website (www.district-properties.com), the company identifies itself as "District

Properties," based at the Chillum Place address. The Relux Homes Website

(www.reluxhomes.com) links to District Properties.  Moreover, on building permit applications,

the company typically identified itself as "District Properties," even when the corporate owner of

the property was a sub-entity like Rupsha 2013.

      33.     Based on records that I have reviewed, District Properties has hired Elite

Technical LLC to conduct LBP inspections and complete other activities related to LBP at

properties being renovated in DC. Elite Technical LLC is a contractor that performs lead

abatement, inspections, demolition, and risk assessments. The company is a DC-certified lead abatement company with a company license number of DC14-4361. It has its principal place of business at 4220 9th Street SE, #23B, Washington DC, 20032. The company's CEO is Chijioke Onuoha. In an interview with an EPA Region 3 Civil Enforcement inspector on November 12, 2015, Onuoha claimed that his company had no other employees.

34.     I have checked EPA's database of renovators that are certified to conduct renovation work on a property subject to the RRP Rule, and none of the companies named above are certified to perform this work.

35.     I respectfully submit that there is probable cause to believe that District Properties violated 15 U.S.C. §§ 2689 and 2615(b), by (1) performing renovation work on target (pre-1978) housing without using a certified renovator, following recordkeeping requirements, or following lead-safe work practices; and (2) failing to disclose information and reports in District Properties' possession to prospective buyers, relating to LBP and LBP hazards at pre-1978 residential properties it renovated and re-sold. This affidavit will discuss District Properties' general practices with regard to pre-1978 properties before describing the facts concerning three specific properties.

### *District Properties' Pre-1978 Properties*

36.     Since 2011, District Properties has purchased, renovated, and listed for sale at least 24 properties in Washington, DC that were constructed prior to 1978, according to the DC Office of Tax and Revenue Real Property Tax Database, which is publically available on DCRA's website. According to a DCRA representative I spoke to, this database is the authoritative source of information about the age of a DC property. District Properties also has at least one property (the "Whittier Property," discussed below) that is currently being renovated

and was constructed prior to 1978.  A summary of the information found in this section can be found in a chart at the end of the section.

37.      Based on my experience and knowledge concerning the real estate industry, I am aware that sellers of residential properties typically "list" their home on a Multiple Listing Service ("MLS"), a cooperative of agents and brokers who share listings in a market area. The Metropolitan Regional Information Systems ("MRIS") is a large MLS serving the DC area. According to the MRIS website, it supports over 45,000 real estate professionals. Real estate listings typically provide certain basic information to a potential purchaser, including, for residential properties, the "Year Built." The listing is a common source of information for potential purchasers. I spoke to several licensed DC-area real estate agents as part of this investigation; each agent stated (in summary) that the Real Property Tax Database is the authoritative source for a building's date of construction, and that the "Year Built" in the MLS listing is also used informally. The agents did not know of any other reliable source where the date of construction may be obtained.

38.      I reviewed the publically-available MRIS listings for 22 of the 24 pre-1978 residential properties purchased by District Properties since 2011 (two listings were not available). These are the listings that were available at the time District Properties bought the properties. At least 13 of these properties were purchased since January 1, 2013. Each and every listing accurately stated that the residence was constructed prior to 1978.

39.      After purchasing the properties, District Properties submitted building permit applications to DCRA for each of these 24 pre-1978 properties, to conduct renovation work with the intention to resell. I reviewed the applications associated with 22 of the properties. (I have requested but not yet received the other applications from DCRA.)  The applications required the

person submitting it to certify that the application was "complete and correct to the best of my knowledge." Building permit applications for 21 of the 22 properties falsely stated that the property was built after 1978. (One of the earliest applications I reviewed, from 2011, did not ask whether the property was pre-1978, so there was no statement in this regard.) For one of these 22 properties (the "Aberfoyle Property," discussed below), District Properties completed four separate applications. In the first application, District Properties correctly stated that the building was pre-1978, but in the next three applications, the company falsely stated otherwise. SIKDER was listed as the engineer on each application I reviewed. All of the applications I reviewed also indicated that District Properties intended to conduct renovation work on a scale that would very likely require District Properties to comply with the RRP Rule. That is, the scope of the work called for substantial renovation activity that, in my experience, would almost always involve the disturbance of more than 6 square feet of interior painted surfaces per room or 20 square feet of the exterior painted surfaces. The building permits issued by the city specifically stated that "[w]henever any such work related to this Permit could result in the disturbance of lead based paint, the permit holder shall abide by" the RRP Rule. By falsely stating that the properties were built after 1978, and thereby not alerting DCRA to the potential presence of LBP at those properties, the company could more easily evade compliance with federal and local laws.

40.     I also reviewed information on MRIS for the 24 pre-1978 properties renovated and listed for sale by District Properties since 2011. At least 22 of the listings posted by District Properties at the time of resale contain language indicating that significant renovation work on a scale that would likely be subject to the RRP Rule occurred. Examples of this kind of language include: "Another fabulous top to bottom renovation by District Properties building your dream home" (Source: 1216 Kennedy Street NW); "Stunning 4500+ sq ft, total renovation" (Source:

1315 Delafield Place NW); "Barnaby Woods Gem renovated from top to bottom will sweep u

off ur feet" (Source: 3284 Aberfoyle Place NW); "Majestic Tudor on a corner lot. Top to bottom

renovated and expanded home" (Source: 4323 Garfield Street NW).

41.     Each of the 24 listings I reviewed for the pre-1978 properties sold by District

Properties since 2011 included accurate information for the "Year Built," that is, a year that

matches what is recorded in the DC Real Property Tax Database.

42.     In sum, District Properties completed renovation work on at least 24 pre-1978

homes in DC, including at least 13 since 2013. District Properties falsely claimed a post-1978

construction date on building permit applications for every property reviewed to date (22 total)

about which the company was asked about the date of construction. The company made these

false statements even though both the DC Real Property Tax Database and the MRIS listing from

the time of purchase showed that the properties were pre-1978.

43.     The evidence gathered so far indicates that District Properties knew the correct

date of construction for its properties. First, District Properties is an experienced renovator that

has worked on dozens of properties. Second, District Properties listed 24 pre-1978 properties for

sale with the correct date of construction, including all of the properties the company falsely

claimed were post-1978 in building permit applications. Moreover, I have obtained federal lead-

paint disclosure forms signed by District Properties for 12 of the pre-1978 properties the

company sold since 2011. Ten of the 12 forms accurately state that the relevant properties were

pre-1978, including three on which the exact date of construction is handwritten (not all of the

forms required the exact date). On one of the forms District Properties failed to make any

disclosure as to the age of the property, and on another form the company inaccurately claimed

that a property was post-1978. SIKDER's signature appears to be on all of the disclosure forms I have reviewed.

44.     The legal significance of the properties' pre-1978 status and District Properties' knowledge of this status is specifically explained below with regard to two pre-1978 properties at which LBP was found to be present.

**Summary Chart: District Properties' Known Pre-1978 Properties Since 2011**

| Address | Year Built (Source: DC Office of Tax and Revenue) | Date Purchased (Close Date) by District Properties (Source: MRIS) | Year Built on Listing when Purchased by District Properties (Source: MRIS) | Listed as Post-1978 on Building Permit Application? (Source: DCRA) | Disclosed as Pre-1978 by District Properties (Source: Sales Contract Disclosure Document) | Property Owner According to Deed (Source: DC Office of Tax and Revenue- Recorder of Deeds) |
|---|---|---|---|---|---|---|
| 1003 Evarts Street NE, Washington DC | 1918 | 6/22/2012 | 1918 | Yes | Unknown | RUPSHA 2012 Inc. |
| 1216 Kennedy Street NW, Washington DC | 1923 | 9/27/2012 | 1923 | Yes | Yes | RUPSHA 2013 Inc. |
| 1315 Delafield Place NW, Washington DC | 1912 | 7/25/2013 | 1912 | Yes | Unknown | RUPSHA 2013 Inc. |
| 1441 Kearney Street NE, Washington DC | 1905 | Unknown | Unknown | Unknown | Unknown | RUPSHA 2007 LLC |
| 1443 G Street NE, Washington DC | 1912 | 3/1/2013 | 1912 | Yes | Yes | RUPSHA 2013 Inc. |
| 1508 D Street NE, Washington DC | 1928 | 12/21/2012 | 1928 | Yes | Yes | RUPSHA 2013 Inc. |
| 1618 Newton Street NE, Washington DC | 1923 | 8/26/2011 | 1923 | The question was not asked in the permit application. | Unknown | RUPSHA 2007 LLC |
| 228 15th Street NE, Washington, DC 20002 | 1925 | 3/12/2013 | 1925 | Yes | Unknown | RUPSHA 2013 Inc. |
| 2718 Hamlin Street NE, Washington DC | 1921 | 3/13/2013 | 1921 | Yes | No | RUPSHA 2013 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 3284 Aberfoyle Place NW, Washington DC | 1949 | 4/26/2012 | 1949 | First application stated that building/ structure was built before 1978, but in subsequent building permit applications submitted for the same property, District Properties stated that the building/ structure was built after 1978. | Yes | RUPSHA 2012 Inc. |
| 3520 South Dakota Avenue NE, Washington DC | 1926 | 1/28/2013 | 1926 | Yes | Unknown | RUPSHA 2013 Inc. |
| 3800 52nd Street NW, Washington DC | 1958 | 10/2/2014 | 1958 | Yes | Unknown | RUPSHA 2013 Inc. |
| 3801 52nd Street NW, Washington DC | 1957 | 10/2/2014 | 1957 | Yes | Unknown | 52nd St Development Inc. |
| 3912 5th Street NW, Washington DC | 1912 | 5/4/2012 | 1912 | Yes | Unknown | RUPSHA 2012 Inc. |
| 4323 Garfield Street NW, Washington DC | 1929 | 5/30/2014 | 1929 | Yes | Yes | RUPSHA 2013 Inc. |
| 4327 8th Street NW, Washington DC | 1907 | 12/24/2012 | 1907 | Yes | Unknown | RUPSHA 2013 Inc. |
| 4404 15th Street NW, Washington DC | 1917 | 11/7/2012 | 1917 | Yes | Yes | RUPSHA 2013 Inc. |
| 4807 Davenport Street NW, Washington DC | 1924 | Unknown | Unknown | Yes | Yes | RUPSHA 2013 Inc |
| 5231 Connecticut Ave NW, Washington DC | 1924 | 5/28/2012 | 1924 | Unknown | Unknown | RUPSHA 2012 Inc. |
| 5243 Sherier Place NW, Washington DC | 1942 | 1/26/2015 | 1942 | Yes | Unknown | RUPSHA 2007 LLC |
| 5329 Illinois Ave NW, Washington DC | 1910 | 4/29/2013 | 1910 | Yes | Yes | RUPSHA 2013 Inc. |
| 5525 30th Street NW, Washington DC | 1936 | 1/24/2013 | 1936 | Yes | Yes | RUPSHA 2013 Inc. |
| 5536 30th Place NW, Washington DC | 1935 | 3/29/2013 | 1935 | Yes | Unknown | RUPSHA 2012 Inc. |

| 6625 Harlan Place NW, Washington DC | 1925 | 6/9/2014 | 1925 | Yes | | Yes | RUPSHA 2013 Inc. |
|---|---|---|---|---|---|---|---|

### *Garfield Property*

45.     The purchase money construction deed of trust for 4323 Garfield Street NW (hereinafter "Garfield Property") bears what appears to be District Properties CEO SIKDER's signature and was recorded on June 18, 2014, with the District of Columbia's Recorder of Deeds. District Properties purchased the property using a subsidiary entity, Rupsha 2013 Inc. The deed of trust states that the property plat and associated easements/right of ways were recorded in the Office of Surveyor for the District of Columbia in 1929. The Real Property Tax Database states the home was constructed in 1929. The MRIS listings from when District Properties purchased the home and when the company offered the home for resale each state that the "Year Built" was 1929. This property went under contract for sale by District Properties on September 21, 2016. The sales contract includes an acknowledgement by SIKDER that the property was built before 1978.

46.     On October 14, 2014, District Properties submitted a building permit application to DCRA for addition, alteration, and repair of the property. Under the section of the application titled "Lead Abatement," there was a question asking whether the property was built prior to 1978. The box "no" was checked.  SIKDER was listed as the engineer for the work.

47.     On November 21, 2014, DCRA Inspector Robert Cluff ("Inspector Cluff") visited the property in response to a citizen complaint. In a written report with photographs that I reviewed, Mr. Cluff wrote that "structural interior demolition occurred before my arrival." The photographs show that the building had undergone significant demolition activities. Numerous windows were removed, as well as exterior painted surfaces that appear to be larger than 20

square feet, and interior painted surfaces that appear to be larger than 6 square feet. Inspector

Cluff issued a Notice of Infraction and Stop Work Order to Rupsha 2013 Inc. for exceeding the

scope of its building permit and failing to post signage required by the city.

48.     On July 8, 2015, District Properties hired Elite Technical to perform a LBP

inspection at the Garfield Property. I have reviewed a copy of the initial report resulting from

this inspection. (As discussed below, the report was later amended.) The initial report stated that

the property was built prior to 1978 and "Lead-based paints were not found on the tested paint

surfaces analyzed," and that "lead-paint hazards do not exist in the property." However, this

testing occurred only after the building interior was already gutted. Moreover, the actual test

results attached to the report showed that the paint chips sampled from the exterior met HUD's

definition of a lead-based paint surface with sample results meeting or exceeding a measurement

of 0.5 percent lead.  Further, the samples were not collected from "each painted component

affected by the renovation," as would be required to exempt further renovation work from the

RRP Rule under 40 C.F.R. § 745.82.1 (The renovation work already conducted could not have

been exempt because no testing had occurred yet.) Only 10 samples were taken from the entire

---

[1] Under 40 C.F.R. § 745.83: "Component or building component means specific design or structural elements or fixtures of a building or residential dwelling that are distinguished from each other by form, function, and location. These include, but are not limited to, interior components such as: Ceilings, crown molding, walls, chair rails, doors, door trim, floors, fireplaces, radiators and other heating units, shelves, shelf supports, stair treads, stair risers, stair stringers, newel posts, railing caps, balustrades, windows and trim (including sashes, window heads, jambs, sills or stools and troughs), built in cabinets, columns, beams, bathroom vanities, counter tops, and air conditioners; and exterior components such as: Painted roofing, chimneys, flashing, gutters and downspouts, ceilings, soffits, fascias, rake boards, cornerboards, bulkheads, doors and door trim, fences, floors, joists, lattice work, railings and railing caps, siding, handrails, stair risers and treads, stair stringers, columns, balustrades, windowsills or stools and troughs, casings, sashes and wells, and air conditioners."

property, including samples of only three brick wall sides. No samples were taken of the ceilings. According to a report I have reviewed of an interview of Elite Technical CEO Onuoha by EPA Region 3 Civil Enforcement Inspector Paul Ruge ("Inspector Ruge") on November 12, 2015, Onuoha acknowledged that he only tested the exterior of the property. District Properties possessed a copy of Elite's initial report and provided it to Inspector Ruge on October 15, 2015.

49.     On August 19, 2015, Inspector Ruge received a citizen complaint regarding the Garfield Property from a neighbor. The complainant alleged that District Properties was illegally renovating the property and raised concerns about neighbors, workers, and potential future homeowners being exposed to LBP.

50.     Acting on the complainant's tip, Inspector Ruge visited the Garfield Property on August 28, 2015. He saw two or three workers engaged in activity on the exterior structure of the property, and he observed and photographed a District Properties truck on-site. Inspector Ruge's observations from the inspection were memorialized in an Inspection Report dated August 23, 2016, which I have reviewed. According to this report, "Inspector Ruge observed that windows, window frames, doors, door frames, and painted siding were removed from the residence." Under the RRP Rule, the fact that windows were removed meant that the work could not qualify as a "minor repair [or] maintenance activit[y]." 40 C.F.R. § 745.83. In addition, Inspector Ruge observed that, "[d]emolition debris was on the ground on all sides of the residence." Based on the age of the property, Inspector Ruge identified the likely presence of LBP that was peeling from the remaining window frame woodwork, the siding where it was torn away, and from the soffits on the east side of the house.

51.     On September 24, 2015, the federal Occupational Safety and Health Administration (OSHA) conducted an inspection of the property. A letter sent by OSHA to

SIKDER, dated February 3, 2016, notified District Properties that employees were found to have performed manual demolition on lead surfaces. The letter states that samples taken by the inspector showed that lead was present on the hands of employees conducting renovations and on a truck nearby. The letter also stated: "Your employees performed manual demolition on a wall surface that had lead containing paint and no lead training was provided."

52.     Because the property was built before 1978 and testing was inadequate to demonstrate that no LBP was present, any renovation work on the Garfield Property was required to comply with the RRP Rule and should have been carried out by an EPA-certified renovator. 40 C.F.R. § 745.82. I checked EPA's publically-available database and confirmed that District Properties is not and has never been an EPA-certified renovator. In addition, Elite Technical is not and has never been an EPA-certified renovator.

53.     Because the renovation was subject to the RRP Rule, the renovator was required to follow applicable lead-safe work practices, as described above. *See* 40 C.F.R. § 745.85. According to a written complaint to EPA from a private citizen, which I have reviewed, the complainant observed several violations of these practices, including failure to contain dust and debris, resulting in the release of these materials onto adjacent properties.

54.     The Garfield Property was listed for sale on June 8, 2016, for $2,987,000. After the listing, District Properties hired a different DC-certified environmental risk assessor, Green Environmental, to complete a new LBP inspection of the Garfield Property on August 23, 2016. A report based on the inspection is dated August 31, 2016. I reviewed the report. The report stated that LBP dust levels were within permissible federal limits, and that the property "has passed" the inspection. The report does not show an absence of LBP – only that LBP dust was within acceptable limits. Unlike the previous inspection performed by Elite Technical on July 8,

2015, this new inspection contained samples mostly from the inside of the residence. There were only two exterior samples taken, from the "floor" of the front and rear exterior. Moreover, the inspection occurred only after the building was gutted, the main renovation work was completed, and the home was listed for sale.

55.     On September 2, 2016, Elite Technical CEO Onuoha produced an amended report based on his inspection of the Garfield Property on July 8, 2015. Onuoha had been contacted in late August by DOEE regarding the discrepancy in his initial report between his claim that no LBP was present at the property and the attached test results showing the presence of LBP. According to DOEE, Onuoha acknowledged that he made a mistake. His revised report, which I reviewed, expressly states that LBP was found at several places on the property, including the side porch fascia, brick walls, and exterior door and window trims. The report states that "lead-paint hazards do exist in the property," that "[a]ll lead-based paint components will have to be made intact, or remediated in order to be safe," and that "the positive components have to be remediated, before renovation activities can continue on this property." Finally, the report expressly states: "Federal law requires that this property's owner provide a copy of this lead-paint inspection report . . . to future tenants or purchasers of this property before they become obligated under a lease or sales contract." According to a DOEE timeline I was provided, this revised report was e-mailed by a DOEE representative to SIKDER and JHA of District Properties and its real estate agent on September 2, 2016, almost three weeks before the home went under contract for sale.

56.     The property went under contract on September 21, 2016, and one of the prospective buyers was pregnant at the time. The sale has not closed according to MRIS.

57.     Once LBP has been identified at a property, the seller must "disclose any additional information available concerning the known lead-based paint" to the buyer, including "the basis for the determination that lead-based paint . . . exist[s]." 40 C.F.R. § 745.107(a)(2). The seller must also "provide the purchaser or lessee with any records or reports available to the seller or lessor pertaining to" LBP at the target housing. *Id.* (emphasis added). On November 18, 2016, DOEE sent a letter to District Properties requesting "any DC lead disclosure forms provided for" several properties, including the Garfield Property. In response, District Properties provided the federally-required LBP disclosure form. On the form, District Properties checked two boxes stating, "Seller has no knowledge of lead-based paint and/or lead-based paint hazards in the housing," and "Seller has provided Buyer with all available records and reports pertaining to lead-based paint and/or lead paint hazards in the housing," after which District Properties handwrote: "Inspection rport [sic] showing absence of lead in the house." There is no indication that District Properties updated the form to reflect the revised Elite Technical inspection report that DOEE emailed to District Properties on September 2, 2016, showing that Elite Technical had found LBP on the exterior of the home or the letter dated February 3, 2016, from OSHA, stating that during an inspection of the property, lead had been found.

58.     On March 16, 2017, I obtained copies of all nine documents attached to the MRIS listing for the sale of the Garfield Property by District Properties. The listing purports to contain the property's lead disclosures. However, neither the initial Elite Technical inspection report containing test results showing the presence of LBP, nor the revised Elite Technical report from September 2, 2016, expressly stating the LBP hazards were present at the time of inspection, was attached to the listing. The letter from OSHA discussing lead found at the property was also not

attached to the listing.  On April 26, 2017, I spoke with one of the prospective buyers, who said that he had not seen any reports stating that LBP was ever present at the property.

59.     Under 40 C.F.R. § 745.107(a)(4), District Properties was required to disclose "any records or reports available to the seller or lessor pertaining to lead-based paint and/or lead-based paint hazards in the target housing being sold or leased." Based on the information provided above, I believe there is probable cause that District Properties knowingly violated this regulation, and therefore TSCA, by failing to provide Elite Technical's inspection reports or the OSHA letter to the person(s) who are obligated under a sales contract to purchase the home.

### *Aberfoyle Property*

60.     The DC Real Property Tax Database states that the property at 3284 Aberfoyle Place, NW, Washington, DC 20015 (hereinafter, "Aberfoyle Property") was built in 1949. District Properties purchased the home on April 26, 2012, for $500,000, under the name Rupsha 2012 Inc. The MRIS listings for the home when purchased and when District Properties resold it on February 28, 2013 for $805,000, each correctly state that the "Year Built" was 1949.

61.     On April 17, 2012, District Properties submitted a building permit application to DCRA for alteration and repair of the property. The scope of work is stated as "Renovation of SFD [Single Family Dwelling]." Under the section of the application titled "Lead Abatement," the question asking whether the property was built prior to 1978 is answered "yes." However, the application claimed that more than 2 square feet of lead paint would not be removed. It is unclear how District Properties would have made this determination, as the property appears to have not yet been tested for LBP. (Or if it had, District Properties failed to provide this inspection as part of its seller's disclosures, which would be also be a violation of federal law, see below.) SIKDER is listed as the engineer for the work, and District Properties is listed as the contractor.

On July 13, 2013, District Properties submitted a second building permit application to DCRA containing a revision to the previously granted permit. This time, the box "no" was checked for the question about whether the property was built prior to 1978. The company subsequently submitted two more applications in which the "no" box was checked.

62.     On April 30, 2012, DCRA received a citizen complaint associated with the Aberfoyle Property from a neighbor on the street. The complainant alleged that District Properties was performing demolition activities without taking precautions for the disturbance of LBP.

63.     DOEE Lead Inspector Shawn Wright and DCRA Inspector Robert Cluff jointly visited the Aberfoyle Property on April 30, 2012. According to Inspector Cluff's notes, which I have reviewed, no one was present at the property at the time of inspection. Inspector Cluff's notes state that "demolition activities have taken place" on the interior of the property. No permits were posted for the work as required under DC law. As a result of the inspection, Inspector Cluff issued a Stop Work Order for the property for conducting demolition work without a permit. According to the inspector's notes and photographs, the Stop Work Order was physically posted on the front door of the property. In addition, Inspector Wright issued a Notice of Violation and Order to Eliminate Lead-Based Paint Hazard(s) ("Notice of Violation"). The Notice of Violation, which I have reviewed, indicates that LBP hazards were identified on the exterior concrete window sills and on the right and left side concrete foundation wall. It required the property owner to abate all of the LBP hazards at the property that were identified during the DOEE inspection. Both the Stop Work Order and the Notice of Violation were issued to the name of the previous owner of the property before District Properties, even though District Properties was the owner at the time. A representative from DCRA that I spoke to explained that

the new ownership had not yet been recorded with the city. District Properties' subsequent actions, including the submission of a new building permit application and hiring of Elite Technical to perform abatement work, demonstrate that it received both the Stop Work Order and Notice of Violation.

64.     District Properties hired Elite Technical to conduct an LBP inspection of the property on May 11, 2012. Senior Project Manager JHA provided EPA Region 3 Civil Enforcement Inspector Ruge with a copy of the report drafted by Elite Technical during Inspector Ruge's visit to the company's office on Chillum Place NW on October 15, 2015. The report states that, "Lead-based paint hazards were found in this property," including "deteriorating lead-based paints with evidence of chipping and peeling paint conditions found in the property on the date of visit." The hazards affected numerous building components including the front door, dining room, back porch, and various parts of the basement. The report advised: "Deteriorated paint conditions in the property identified as lead-based paint should be corrected, and made intact before any renovation activities can continue." The report expressly states that District Properties would be responsible for disclosing the report to future purchasers.

65.     District Properties hired H&D Environmental to conduct an exterior lead visual clearance inspection on June 5, 2012. The inspection did not include the interior of the property. H&D Environmental produced a report to District Properties stating that all lead abatement work was successfully completed on the areas inspected. However, the inspector wrote that he only visually examined the "Front Porch and Grounds," the front entrance, and the "Rear yard and rear area where wooden back-porch was removed." The inspector did not examine the dining room or basement areas where LBP hazards had previously been identified. The report does note that the "interior components in this residence have been gutted."

66.     District Properties submitted the building permit application for the renovation

work, listed its CEO as the engineer, listed itself as the contractor for the work, and assigned a

project manager to oversee the work, indicating that District Properties was a "renovator" under

the RRP Rule. Because the property was built before 1978, any renovation work on the

Aberfoyle Property was required to comply with the RRP Rule, see 40 C.F.R. § 745.82, and

should have been carried out by an EPA-certified renovator.  Because District Properties knew

the Aberfoyle Property was pre-1978, the renovation work it carried out without required EPA

certification was a criminal violation of TSCA under 15 U.S.C. § 2689.

67.     The MRIS listing for the sale of the Aberfoyle Property by District Properties

states that the home was "renovated from top to bottom." On November 30, 2016, I met with the

current homeowner of the Aberfoyle Property who bought the property for $805,000 on February

28, 2013. The homeowner recalled being told by District Properties' real estate agent that the

house was "taken down to the studs," almost completely renovated, and did not have any LBP.

68.     The homeowner provided me with the sales contract from the purchase of the

home, which included the federally-required lead disclosure document, signed with a signature

appearing to be that of SIKDER on January 13, 2013. In this document, District Properties

checked the box reading "Seller/Landlord has no knowledge of lead-based paint and/or lead-

based paint hazards in the housing." District Properties also stated that "Seller/Landlord has no

reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing."

Based on the facts described above, the second statement was false because District Properties

possessed several such records. District Properties failed to disclose the DOEE Notice of

Violation for LBP hazards, Elite Technical's inspection report showing the presence of LBP

hazards, and the H&D Environment LBP post-abatement clearance report, in contravention of its

obligation under 40 C.F.R. § 745.107(a)(4) to disclose "any records or reports available to the seller or lessor pertaining to lead-based paint and/or lead-based paint hazards in the target housing being sold or leased." SIKDER's name and what appears to be his signature are printed at the bottom of the form, certifying to the accuracy of the statements therein.

### Summary of Initial Investigation

69.     Based on my review of public records, District Properties has purchased and sold at least 24 pre-1978 properties since 2011, including 13 since 2013. The company listed its three most recent pre-1978 properties for sale on April 20, 2016, May 30, 2016, and June 8, 2016. For all of the pre-1978 properties the company has purchased or sold since 2011, the correct date of construction was available on the Real Property Tax Database, and was stated accurately in the MRIS listing under "Year Built," at both the time of purchase and re-sale. On at least 9 occasions since 2011, District Properties provided purchasers with federal lead-paint disclosure forms, which appear to be signed by CEO SIKDER, that acknowledged the property was pre-1978. Nonetheless, on building permit applications for 22 of the 24 known pre-1978 properties that District Properties renovated since 2011, and on which SIKDER is listed as engineer, the company falsely claimed the properties were constructed after 1978.

70.     At both the Garfield and Aberfoyle Properties, building permit applications for renovation work were completed by District Properties, listing SIKDER as the engineer. Renovation work conducted or directed by District Properties at these properties appeared to be in violation of the RRP Rule requirement for failing to hire an EPA-certified renovator to do the work at target housing. EPA Region 3 Civil Enforcement determined that federally-required lead-safe work practices were not followed at the Garfield Property. Records related to LBP at the Garfield Property appear not to have been maintained by District Properties for three years,

as required under the RRP Rule. In federally-required LBP disclosures provided to purchasers, District Properties failed to disclose all information pertaining to LBP at both the Garfield and Aberfoyle Properties, as required by the RRP Rule.

71.    Given the patterns and practices described above, there is also probable cause to believe similar conduct, including unlawful renovation work and failure to make proper disclosures of LBP information to purchasers, occurred at one or more of the other properties District Properties has bought and renovated since 2011, including the property on Whittier Street that is the subject of the warrant sought. The company has a consistent practice of purchasing pre-1978 homes, submitting false building permit applications, and performing major renovation work to which the RRP Rule likely applied, and for which the company was not certified. Moreover, I have obtained federal LBP disclosure forms signed by District Properties for a total of 12 pre-1978 properties. For nine of the ten other properties, besides the Garfield and Aberfoyle Properties, for which I have obtained these forms, the company has denied knowledge to the buyer of any reports or records related to LBP at the property. For the tenth property, the company did not provide any answer about whether such records exist.

### *Search of District Properties and Interviews*

72.    Based in part on the information above (some of which has been updated), I obtained a warrant to search District Properties' Chillum Place office. The search was executed on April 25, 2017, and the warrant was returned on April 26, 2017. Review of the materials obtained during the search is ongoing.

73.    During the execution of a federal search warrant, EPA agents interviewed Taher Khatib ("KHATIB"), an employee of District Properties. KHATIB said that there are around 13-14 employees working at District Properties. Everyone reports to SIKDER, who is very much

involved in all aspects of the company. KHATIB described SIKDER as a micromanager and said one "could say he's in charge of everything." KHATIB said that he is responsible for permit processing at the company, including submitting building permit applications to DCRA. KHATIB said he was aware that there are special processes that must be followed when renovating older homes. He said that because SIKDER does not want to delay work, SIKDER tells KHATIB to put down on permit applications that properties are built after 1978. KHATIB has suspected that in some cases the homes were pre-1978. KHATIB did not think he has ever checked the box on the application indicating that a property was built before 1978.

74.      On May 5, 2017, during an interview with EPA agents, Elite Technical CEO Chijioke Onuoha stated that he has performed LBP inspections or abatement on five or six properties owned by District Properties, and that he is currently working on a property at 732 Whittier Street NW (hereinafter, "Whittier Property").  Onuoha stated that he did work associated with LBP at this property including clearance testing.

75.      Following the interview with Onuoha, EPA-CID contacted DOEE and learned that complaints associated with LBP were reported for the Whittier Property.

**Whittier Property**

76.      According to the DC Real Property Tax Database, the Whittier Property was built in 1932.  Jayesh Sanghvi purchased the home on January 3, 2017, for $440,000.  Real Estate listings from when the home was purchased by Sanghvi stated that the "Year Built" was 1932. The DC Office of Tax and Revenue states that Sanghvi resides in New Jersey indicating that the home is not currently occupied.  As of June 27, 2017, the property was still undergoing renovation work.

77.     According to DC records, Sanghvi and SIKDER have purchased and sold four apartments at 4610 Kane Place NE, Washington DC 20019 together in the past.  SIKDER served as Sanghvi's power of attorney with regard to all four apartments located at this address. I reviewed the power of attorney documents on a DC government website.

78.     On February 27, 2017, District Properties submitted a building permit application to DCRA for alteration and repair of the property. DC records do not show that any prior building permits had been issued for the property, suggesting that it has not been previously renovated. District Properties is listed as the owner of the property in the permit application. The application described the proposed work as "Internal Renovation. Replacement of units, fixtures, and appliances in Mechanical, Plumbing, and Electrical as per plans." The application indicates that the renovation would affect the first and second floors.  The application states that the gross floor area of the building is approximately 3000 square feet. The application includes a supplemental "Environmental Questionnaire," in which District Properties falsely represented that the home was built after 1978. SIKDER is listed as the affiant for this questionnaire.

79.     On March 15, 2017, DOEE received a citizen complaint associated with the Whittier Property from a neighbor on the street. The complainant alleged that District Properties was performing demolition activities without following lead-safe work practices.

80.     DOEE conducted an inspection on March 16, 2017, and issued a stop work order to the property, which I have reviewed. The stop work order was posted on the front door of the Whittier Property.  The stop work order required District Properties to contain all waste during demolition, obtain a dumpster for this site, and to bag all debris from the work areas. The stop work order was lifted on March 27, 2017.

81.     According to notes from DOEE that I reviewed, on April 14, 2017, the same complainant contacted DOEE and alleged that District Properties continued to perform demolition activities without following lead-safe work practices.  DOEE contacted District Properties to address the concerns raised by the complainant.  On the same day, the environmental engineering firm Air, Land, and Water Engineering, Inc., conducted limited lead paint testing at the direction of Elite Technical CEO Onuoha and identified the presence of LBP at the property. Air, Land, and Water Engineering, Inc. specified that the lead paint testing was limited because only five interior units/rooms were tested rather than testing all units/rooms inside the property. I reviewed a copy of the resulting report.  The report found LBP in one of the five interior units tested (the water heater room), and on three of the four exterior walls tested (the front exterior wall, on the rear exterior C wall, and on the exterior D wall).

82.     On May 8, 2017, R.O. McMillian & Associates submitted a lead abatement permit application to DOEE for this property on behalf of District Properties.  The permit application accurately states the home was built in 1932.  The permit estimated that 350 square feet of LBP were remediated.

83.     On May 12, 2017, R.O. McMillian and Associates received a lead abatement permit for the property from DOEE.  I obtained a copy of the permit application and permit from DOEE. Although the abatement permit proposed to abate most of the LBP identified during the limited testing performed by Air, Land, and Water Engineering, Inc., the firm's prior report had identified LBP on the porch header of the rear exterior C wall, which was not addressed in the abatement permit.

84.     Elite Technical performed a LBP clearance inspection at the Whittier Property on May 17, 2017, which stated that the property passed clearance requirements.  I have reviewed the

resulting report produced by Elite Technical.  During this clearance inspection, a visual

inspection and dust wipe sampling was conducted. No soil sampling was conducted. No dust

wipe sampling or other sampling was completed on the porch header on the rear exterior C wall.

This report also states that the LBP identified previously on the door lintels had been

encapsulated but the abatement permit application stated that the LBP on the door lintels would

be removed through the wet scrape method.  It is unclear whether encapsulation or wet scrape

occurred and therefore whether LBP is still present at these locations.

85.     Because the property was built before 1978, any renovation work on the Whittier

Property prior to the acquisition of the abatement permit was required to comply with the RRP

Rule and should have been carried out by an EPA-certified renovator. 40 C.F.R. § 745.82. The

renovator was required to follow applicable lead-safe work practices, as described above. *See* 40

C.F.R. § 745.85. Based on the information above, it does not appear that District Properties used

an EPA-certified renovator or complied with lead-safe work practices.

86.     On June 23, 2017, the citizen complainant associated with the Whittier Property.

The complainant stated that she became concerned in March 2017 when demolition was initiated

and materials began flying out of the house and landing on the ground and driveway with no

dumpster present.  According to The complainant, the materials were creating a lot of dust from

landing on the ground and breaking up.  She recalled one particular day in March 2017 when

dust from demolition activities at the Whittier Property began flying toward her house from the

wind.  The complainant provided me with a video that she recorded on March 15, 2017. The

video showed demolition activity carried out prior to the filing of an LBP abatement permit

application with DOEE. The video showed materials from inside the Whittier Property being

thrown out the second story and creating dust that was blowing in the direction of the

complainant's property.  Large pieces of debris appeared to land on the ground and break apart.

No dumpster was visible. A child's voice can be heard narrating some of the activity in the

video. The complainant has two small children and was concerned that the children may inhale

the LBP dust or the LBP dust may settle on her property where they play.  The complainant said

that when she mentioned that the workers were required to follow lead-safe work practices to an

employee of District Properties working at the Whittier Property, he told her that he and his

workers didn't know what these practices were.  Eventually, a dumpster and a black Tyvek wall

were placed on the Whittier Property to reduce the migration of the dust but the complainant

stated that most of the demolition work was completed before the wall was installed and she

thought that a lot of dust may have already landed on her property.

     87.    On June 27, 2017, EPA-CID conducted a consent search on the exterior of the

complainant's property to evaluate for the potential presence of LBP in the soil.  Laboratory

samples from this search are still being analyzed.  During the consent search, I could see debris

and dust on the ground at the Whittier Property.  In addition, I could see materials from inside

the Whittier Property being thrown into the dumpster by workers.

     88.    As the renovator of a pre-1978 property, District Properties was required to keep

records that a certified renovator was assigned to the project, that the certified renovator

provided on-the-job training for workers used on the project, that the certified renovator

performed or directed workers who performed all of the tasks required by the lead-safe work

practice standards, and that the certified renovator personally performed the required post-

renovation cleaning verification. *See* 40 C.F.R. § 745.86(b)(6).

Given the patterns and practices previously described and the information obtained related to

current activities at the Whittier Property, there is also probable cause to believe similar conduct,

including unlawful renovation work, was carried out at the premises further described in

Attachment A without required EPA certification which is a criminal violation of TSCA under

15 U.S.C. § 2689.

## PRIVILEGE AND SCOPE FILTER PROTOCOL

89.     Items to be seized are not intended, nor anticipated, to include information

protected by the attorney-client privilege or the attorney work product doctrine. The search itself

and subsequent review, however, may involve exposure to, or the inadvertent review of, items

which are protected by such privilege or doctrine. As is customary law enforcement practice, any

materials encountered by the investigative or prosecution team members that appear to be

privileged or otherwise protected, will be immediately segregated and marked as Potential

Attorney-Client Materials. The purpose of this segregation is to limit exposure to investigative

and prosecution team members and allow for a proper review to be conducted by a team not

associated with the investigative or prosecution teams ("filter team").

90.     With respect to the seizure of electronically-stored information (ESI), prior to

substantive review by the investigative or prosecution teams, ESI will be electronically filtered

using search terms to proactively identify potentially protected materials. Such materials will be

segregated and reviewed in the same manner as hardcopy materials, by a filter team.

91.     Finally, it is possible that materials could be inadvertently seized that are later

determined to fall outside the scope of the warrant. In this event, if the materials are physical,

hard copy, or the sole copy of a document or record, they will be returned to the owner, while if

the materials are a duplicate of an electronic record obtained, for example, through the use of

computer imaging, such duplicate will be erased or otherwise destroyed.

## CONCLUSION

92.     Based on the information described above, I submit that there is probable cause to

believe that District Properties has violated 15 U.S.C. §§ 2689 and 2615(b). I also submit that

there is probable cause to believe that evidence, fruits, and instrumentalities of the crimes, as

described in Attachment B, are contained within the premises described in Attachment A.


Respectfully submitted,


_____
Allison Landsman
Special Agent
Criminal Investigation Division
U.S. Environmental Protection Agency


Subscribed and sworn to before me on _____, 2017


_____
Honorable Deborah A. Robinson
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### The Premises to be Searched

The target Premises to be searched is the following:

The Premises is located at 732 Whittier Street NW, Washington, District of Columbia.  District

Properties is currently renovating the property.



**ATTACHMENT B**
**Items to be Seized**

The items sought to be seized by this search warrant at the Premises listed in Attachment A include the following materials:

A.  Photographs of the Premises.

B.  Environmental samples of materials suspected to contain Lead-Based Paint (LBP) including samples of debris, visible dust, soil, painted surfaces, and the exterior structure of the property.

C.  Environmental samples of materials suspected to contain LBP from the inside of the property including samples of painted surfaces, windows, doors, dust, and debris.

D.  Environmental samples from the ground on or around the property suspected to contain LBP.

E.  Any signs, permits, stop work orders, warnings, engineering plans, structural plans, blueprints, training certifications, or documents of any kind referring to renovation activity at the property or LBP.

**ATTACHMENT C**
**Duration and Special Conditions of Search**

I.         This warrant hereby authorizes the Environmental Protection Agency (EPA), the
Federal Bureau of Investigation (FBI) the Metropolitan Police Department (MPD), the District of
Columbia's Office of Inspector General (DC OIG), and their agents, employees, and contractors
to initiate any search and seizure at the Premises as early as 7:00 a.m. on any date permitted by
the warrant.

II.        EPA, FBI, MPD, and DC OIG executing the search warrant are authorized to
enlist the assistance of EPA's National Enforcement Investigations Center, EPA Region 3's
Office of Enforcement, Compliance, and Environmental Justice, District of Columbia
Department of Energy and Environment, other sworn law enforcement personnel, or technical
personnel necessary to execute the warrant.

III.       This warrant hereby authorizes the EPA, FBI, MPD, DC OIG, and their agents,
employees, and contractors are authorized to remain on the premises twenty-four hours per day,
until the completion of the search or to accomplish the search in a safe, efficient, and complete
manner.

IV.       This warrant hereby authorizes the EPA, FBI, MPD, DC OIG, and their agents,
employees, and contractors to take photographs, to use water, electrical power, and telephone
service at the Premises, to set up necessary equipment, and to establish safety perimeters as they
deem necessary to accomplish the document collection.

V.        This warrant hereby authorizes the EPA, FBI, MPD, DC OIG, and their agents,
employees, and contractors to restrict access to the Premises, including by the owners, for the
duration of the search.